**United States District Court**
For the Northern District of California

1

2

**NOT FOR CITATION**

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5

6    THE REGENTS OF THE UNIVERSITY OF
     CALIFORNIA, a California Public Corporation,          No. C 04-0634 PJH
7
                    Plaintiff,                             **ORDER GRANTING SUMMARY**
8                                                          **JUDGMENT IN PART AND**
             v.                                           **DENYING SUMMARY JUDGMENT**
9                                                         **IN PART**
     MONSANTO COMPANY, a Delaware
10   Corporation,

11                  Defendant.

12   _____/

13          The parties' cross-motions for summary judgment came on for hearing on October 26,

14   2005 before this court.  Plaintiff, the Regents of the University of California (the "UC Regents"),

15   appeared through its counsel, Gerald Dodson, Erik Olson, and Erica Wilson.  Defendant

16   Monsanto Company ("Monsanto") appeared through its counsel, Adrian Pruetz, John B. Quinn,

17   Victoria Maroulis, John D. Van Loben Sels, Irvin E. Tyan, and Robert B. Wilson.  Having read

18   all the papers submitted and carefully considered the relevant legal authority, the court hereby

19   GRANTS the motions for summary judgment in part and DENIES the motions for summary

20   judgment in part, for the reasons stated at the hearing, and as follows.

21                                          **BACKGROUND**

22          The UC Regents is the assignee and owner of U.S. Patent No. 6,692,941 ("the '941

23   patent"), which covers bovine growth hormone ("bGH"), bovine pre-growth hormone, and the

24   DNA molecules that allow for expression of bovine growth hormone and pre-growth hormone.

25          The '941 patent was issued in February 2004, and was the result of four prior patent

26   applications: (1) the '348 application filed in 1980; (2) the '557 application filed in 1983; (3)

27   the '937 application filed in 1987; and (4) the '745 application filed in 1990.  Under the rules

28   espoused by the Patent and Trademark Office ("PTO"), the '941 patent is deemed to relate

**United States District Court**
For the Northern District of California

1  back to the filing date of the first application, i.e., 1980.

2       Monsanto makes, uses, and sells POSILAC, a veterinary drug whose active ingredient

3  is bovine growth hormone.  In order to make POSILAC, Monsanto engages in an extensive

4  production process that includes the use of two bacterial strains, W3110G[pBGH1] and

5  LBB557[pXT757].  These strains include the recombinant plasmids pBGH1 and pXT757,

6  which in turn include the DNA sequences that allow the bacteria to express commercial levels

7  of sometribove, the recombinant form of bGH that comprises POSILAC.

8       A.    The '941 Patent Claims

9       Only claims 1-10 of the '941 patent are at issue here.  These claims are directed to

10  isolated DNA and recombinant DNA molecules that encode bGH amino acid nos. 2-191;

11  recombinant DNA vectors that can express a DNA segment encoding bGH amino acid nos.

12  2-191; and bacteria that contain these DNA vectors.  The claims are also directed to bacteria

13  containing the bGH protein, and methods for making bGH protein using claimed bacteria or

14  vectors.

15       Specifically, the '941 patent claims:

16  1.    "A composition of DNA molecules which consists of DNA molecules

17       encoding bovine growth hormone comprising the amino acid

18       sequence: [sequence]"

19  2.    "A recombinant DNA molecule which comprises a segment encoding a protein

20       in a condition substantially free of DNA encoding bovine pituitary protein other

21       than bovine growth hormone, wherein said segment encodes a protein

22       comprising the amino acid sequence: [sequence]"

23  3.    "The recombinant DNA molecule of claim 2 wherein said segment comprises

24       the nucleotide sequence:  [sequence]"

25  4.    "A microorganism transformed with the DNA molecule of claim 3"

26  5.    "The recombinant DNA molecule of claim 2 which further comprises sequences

27       capable of effecting the expression of said segment when contained in a

28

2

**United States District Court**
For the Northern District of California

1    microorganism"

2    6.    "A microorganism transformed with the DNA molecule of claim 5"

3    7.    "A method to produce bovine growth hormone which method comprises

4         culturing the microorganism of claim 6 under conditions wherein said

5         expression is effected to produce said bovine growth hormone; and recovering

6         bovine growth hormone from the culture"

7    8.    "A microorganism transformed with the DNA molecule of claim 2"

8    9.    "A microorganism that contains bovine growth hormone which hormone has the

9         amino acid sequence: [sequence]"

10   10.   "A method to produce bovine growth hormone which method comprises

11        recovering the bovine growth hormone from the microorganism of claim 9"

12        On March 9, 2005, the court held a hearing on the issue of claim construction.  On

13   March 17, 2005, the court issued its order construing the disputed terms in the above claims.

14   See Claim Construction Order.

15        B.    Procedural History

16        The instant action was filed against Monsanto on February 17, 2004, asserting a claim

17   for patent infringement under 35 U.S.C. § 1 et seq. and seeking damages accordingly.

18   Monsanto answered and counterclaimed, seeking a declaration that the '941 patent is invalid,

19   unenforceable, that the UC Regents are guilty of inequitable conduct, and that no infringement

20   of the '941 patent has occurred.  Monsanto also asserted the affirmative defense of

21   prosecution laches.

22        Both parties now move for summary judgment.  Specifically, the UC Regents move for

23   summary judgment as to: (1) validity; (2) inequitable conduct; and (3) prosecution laches.

24   Monsanto moves for summary judgment as to (1) non-infringement; (2) invalidity and

25   unenforceability; and (3) damages.  Monsanto has also moved to preclude the testimony of

26   the UC Regents' damages expert, Dr. Jeffrey Leitzinger.

27

28

3

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISCUSSION

**I.    Summary Judgment Standard**

Summary judgment is appropriate when the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

**II.    Infringement**

Monsanto seeks a declaration that none of the plasmids, bacteria, or culturing and purification methods it uses in producing POSILAC infringe claims 1-10 of the '941 patent.  It asserts that no infringement occurs, either literally, or under the doctrine of equivalents.

A.    Legal Standard

The court engages in a two-step process in evaluating a motion for summary judgment on infringement.  First, the court determines the scope and meaning of the claims via claim construction; then, the court compares that construction of the patent against the accused products.  See, e.g., Business Objects, S.A. v. Microstrategy, Inc., 398 F.3d 1366, 1371 (Fed. Cir. 2004) (citations omitted).

While claim construction is a matter of law, infringement itself is a question of fact. See, e.g., Frank's Casing Crew and Rental Tools, Inc. v. Weatherford International, Inc., 389 F.3d 1370,1376 (Fed. Cir. 2004) (citations omitted).  Therefore, a plaintiff is only entitled to summary judgment on the question of infringement "if the facts and inferences, when viewed in the light most favorable to [defendant], would not persuade a reasonable jury to return a verdict in favor of . . . the non-moving party."  Business Objects, 398 F.3d at 1371.

Infringement may be proven under two different theories.  First, a claim can be "literally infringed" if each properly construed claim element directly reads on the accused product or process.  See Jeneric/Pentron Inc. v. Dillon Co., 205 F.3d 1377, 1382 (Fed. Cir. 2000). Second, under the doctrine of equivalents, a court may find infringement when an accused product or process is the substantial equivalent of the patented invention – i.e., where the accused product or process performs substantially the same function in substantially the same

4

way to accomplish substantially the same result as the claimed product or process.  See Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 608 (1950); Optical Disc Corp. v. Del Mar Avionics, 208 F.3d 1324, 1335-37 (Fed. Cir. 2000).

    B.    Preliminary Issues

Preliminarily, there are two distinct issues that must be resolved prior to resolution of the infringement issue on the merits.  First, whether the infringement analysis requires that *all* claims of the '941 patent be construed in light of the technology that was known and available to one of ordinary skill in the art as of 1980, when the initial '941 patent application was filed.  Second, whether prosecution history estoppel applies to prevent application of the doctrine of equivalents.

    1.    Known and Available Limitation

Monsanto asserts that all claims are to be construed in light of the technology that was known and available to one of ordinary skill in the art as of 1980, either by operation of this court's claim construction order, in which the court construed claim 7 to require this limitation, or by operation of law via legal precedent.  The UC Regents disputes this assertion, arguing that this court read the known and available limitation into claim 7 only, and that legal precedent demands otherwise.

The court relied on Bayer AG v. Biovail Corp., 279 F.3d 1340, 1348 (Fed. Cir. 2002), in its claim construction order.  See Claim Construction Order at 13.  Bayer AG explicitly sets forth the proposition that claims must be construed with regards to "what was known to one of ordinary skill in [the] art ... at the time of filing, in addition to the claims, the specification, and the prosecution history."  Bayer AG, 279 F.3d at 1348.  In the Bayer AG case, the claims at issue covered a composition of pharmaceutical chemicals, and a treatment method involving that same pharmaceutical composition.  Bayer AG held that the "known and available" limitation on claims construction applied to both claims.

The UC Regents attempts to distinguish Bayer AG by asserting that it was limited to the issue of collateral estoppel.  It also cites to Bio-Technology Gen. Corp. v. Genentech, Inc.,

5

United States District Court
For the Northern District of California

1  80 F.3d 1553 (Fed. Cir. 1996) and Amgen Inc. v. Hoescht Marion Roussel, Inc., 314 F.3d

2  1313, 1335 (Fed. Cir. 2003) as support for the fact that no "known and available" requirement

3  should be mandated.  While its written advocacy is persuasive, its legal arguments are not.  A

4  reading of Bayer AG demonstrates that the court was considering claims construction with

5  respect to the infringement issue specifically (and even reversed the district court's grant of

6  summary judgment as to non-infringement), and held that the known and available limitation

7  applied to product and process claims alike.

8       Other case law also supports this notion.  See, e.g., Schering Corp. v. Amgen Inc., 222

9  F.3d 1347, 1353 (Fed. Cir. 2000) ("th[e] court must determine what the [claim] term meant at

10  the time the patentee filed the [] application"); Markman v. Westview Instr., Inc., 52 F.3d 967,

11  968 (Fed. Cir. 1995) ("[T]he focus in construing disputed terms in claim language is not the

12  subjective intent of the parties to the patent contract when they used a particular term.  Rather

13  the focus is on the objective test of what one of ordinary skill in the art at the time of the

14  invention would have understood the term to mean.").

15       Moreover, Bio-Technology Gen. Corp. does not directly support the UC Regents'

16  argument.  While true that the court in that case found infringement of a process claim directed

17  to a recombinant DNA method for producing hGH, the court made no specific statement

18  holding that literal infringement – or claim construction – is to be decided regardless whether

19  the accused infringer's methods used later-developed technology.  As for Amgen Inc., the

20  court there construed claims covering DNA sequences for the protein erythropoietin ("EPO")

21  to include both exogenous and endogenous DNA.  Although the UC Regents is correct that the

22  accused infringer in that case made exogenous DNA through a process involving later-

23  developed technology, the court's actual holding in construing the claims focused only on the

24  plain meaning of the claims, and found that exogenous DNA was encompassed by the claims

25  since the claims themselves did not specify that they covered one or the other.  As with Bio-

26  Technology Gen. Corp., the Amgen Inc. court made no specific holding that claim construction

27  is to be decided regardless without reference to what was known and available as of the time

28

the patent application was filed.

Accordingly, the court finds that, as a matter of law, the construction of the '941 patent claims – as set forth in the court's claim construction order – is made with reference to what those claims meant as of 1980, when the '941 patent was filed.

In so holding, the court is not unmindful of the policy arguments made by counsel for the UC Regents at the hearing on the instant motions.  Specifically, counsel pointed out that the value in seeking pioneering patents – such as those that opened up the biotechnology industry – would be rendered worthless, if the claims of those patents are to be construed in accordance with what was known and available at the time those patent applications were filed.  To this, however, the court responds that the proper place to address such a concern is at the second stage of the infringement analysis – i.e., the point at which, having construed the claims, the court must decide whether the accused product or process either literally, or under the doctrine of equivalents, reads on the properly construed claim.  As is made clear by the case law, this question of infringement itself – specifically under the doctrine of equivalents – is measured under a "time of infringement" approach, and does encompass later-developed technology.  See, e.g., Smithkline Beecham Corp. v. Excel Pharm., Inc., 356 F.3d 1357, 1364 (Fed. Cir. 2004) (noting "after-arising technology" as the "quintessential example of an enforceable equivalent"); DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1333 (Fed. Cir. 2001) ("there is no requirement that equivalents be unknown to science at the time of the application"); Atlas Powder Co. v. E.I. du Pont de Nemours & Co., 750 F.2d 1569, 1581 (Fed. Cir. 1984) ("It is not a requirement of equivalence ... that those skilled in the art know of the equivalence when the patent application is filed or the patent issues.  That question is determined as of the time infringement takes place.").

In sum, while the "known and available" limitation is properly taken into account at the claim construction stage, and can serve to limit the literal scope of claims to what was known and available at the time of filing, it does not prevent the court from taking later-developed technology into account in determining whether infringement of a claim has occurred.

7

**United States District Court**
For the Northern District of California

1          2.          Prosecution History Estoppel

2          Monsanto also argues that, with respect to claims 1-2 in particular – which cover DNA

3    molecules encoding bGH – the UC Regents cannot succeed in proving infringement under the

4    doctrine of equivalents.  This is because, under the doctrine of prosecution history estoppel,

5    the UC Regents allegedly "surrendered" any claims directed to synthetic DNA molecules

6    encoding bGH.  Naturally, the UC Regents disputes this assertion, and argues that any

7    arguments it made to the PTO examiner regarding synthetic DNA were directed to whether

8    the prior art was enabling, not the scope of any patent claims.

9          Prosecution history estoppel operates when a patent applicant gives up some

10   limitation or subject matter during the patent's prosecution to obtain allowance of the patent.

11   Having done so, the doctrine precludes the patent applicant from recapturing, through the

12   doctrine of equivalents, what he/she expressly disclaimed during prosecution.  Warner-

13   Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 20 (1997).  As Monsanto correctly

14   points out, prosecution history estoppel applies to matter surrendered either as a result of

15   amendments to overcome patentability rejections, or as a result of argument to secure

16   allowance of a claim.  See, e.g., Deering Precision Instr., LLC v. Vector Distrib. Sys., Inc., 347

17   F.3d 1314, 1324-25 (Fed. Cir. 2003).

18         Monsanto offers no proof of amendment based estoppel.  As to argument based

19   estoppel, Monsanto offers into evidence several written communications that the UC Regents

20   sent to the PTO during prosecution, which communications show that the UC Regents

21   addressed several possible rejections on the basis of prior art references.  See Declaration of

22   Van Loben Sels in Support of Monsanto's Motion for Summary Judgment re Non-Infringement

23   ("Van Loben Sels Decl."), Exs. AA, BB, CC.  The UC Regents, in their communications,

24   argued that the prior art references did not support a conclusion that one skilled in the art

25   could have synthesized a DNA sequence encoding bGH.  See id.

26         These communications, however, are insufficient to establish prosecution based

27   estoppel.  From them, it appears clear that the UC Regents' arguments to the PTO examiner

28

8

**United States District Court**

For the Northern District of California

1    were directed to specific prior art references and the limited issue of whether those prior art

2    references rendered the patent obvious or anticipated.  Specifically, the UC Regents argued

3    that the prior art, which disclosed a complete amino acid sequence encoding for bGH, as well

4    as methods for chemically synthesizing DNA, did not render obvious or anticipated the UC

5    Regents' patent claims *to the DNA sequence encoding bGH*.  This is not the same as

6    arguing that the claims themselves did not cover any synthetic DNA sequence encoding bGH,

7    and Monsanto points to no evidence that the UC Regents actually argued that the claims

8    covering the DNA sequence encoding bGH were limited to non-synthetic DNA.  Indeed, the

9    proffered evidence actually presumes that the claims *did* cover synthetic DNA, for as the UC

10   Regents points out, it would be non-sensical for the examiner to have initially rejected claims in

11   view of prior art disclosing synthetic DNA, if the claims did not actually cover synthetic DNA in

12   the first place.

13           In short, it cannot be said that Monsanto has affirmatively proven the existence of

14   subject matter limitations as to the claims of the '941 patent during prosecution history, such

15   that prosecution history estoppel could be held to apply.  Accordingly, the court finds that it

16   does not.

17           Having dispensed with the above preliminary issues, the court now turns its attention to

18   the merits of the infringement analysis.

19           C.      Infringement Analysis

20                   1.      Claims 1-2

21           Claims 1 and 2 cover all DNA and recombinant DNA molecules encoding bGH.  See,

22   e.g., Claim Construction Order at 8.  Claim 1 specifically refers to any "composition" of such

23   molecules.  See Van Loben Sels Decl., Ex Z.

24           Monsanto claims that it does not infringe claims 1 and 2, literally or under the doctrine

25   of equivalents, because (1) it does not make, use, or sell any "composition" of its plasmids

26   pBGH1 or pXT757 and (2) its plasmid pXT757 has a completely synthetic DNA encoding

27   bGH.

28

United States District Court
For the Northern District of California

1

a.     Use of pBGH1 and pXT757

2      Monsanto asserts that it has not made, used, or sold any "composition" of pBGH1 and

3   pXT757 since prior to issuance of the '941 patent.  In so arguing, Monsanto misses the point.

4   The question is not whether Monsanto has made, used, or sold any "compositions" of pBGH1

5   or pXT757.  The question is whether Monsanto has made, used, or sold any cDNA or DNA

6   molecules that encode for bGH.  Since Monsanto admits that the recombinant plasmids

7   pBGH1 and pXT757 contain the DNA molecules that encode bGH, see Opening Brief re Non-

8   Infringement at 3:21-22, the question is simply whether Monsanto has made, used, or sold

9   pBGH1 and/or pXT757.

10      pBGH1.  Monsanto presents evidence that it stopped using pBGH1 altogether in

11   September 2003.  See Van Loben Sels Decl., Ex. B.  In response, the UC Regents submits

12   evidence that purportedly proves Monsanto's use of pBGH1 in the making of "old strain"

13   powder after September 2003.  See Declaration of Timur Engin in Support of UC Regents'

14   Opposition to Motion for Summary Judgment re Non-Infringement ("Engin Decl."), Exs. H; I at

15   261:6-10.

16      The UC Regents' evidence fails to raise a material disputed fact.  The UC Regents

17   sets forth an alleged "breakdown" of "formulation batches," with no affirmative proof that any

18   particular batch set forth in the breakdown pertains to pBGH1 specifically, nor any proof that

19   such a batch, if it exists, was made after February 2004 – which is the relevant date for

20   infringement purposes.  Nor can the deposition testimony relied on by the UC Regents provide

21   the missing link:  that testimony asserts only that old strain powder was formulated as of

22   February 2004, but provides no corresponding link to whether pBGH1 was an ingredient of

23   that old strain powder.  In short, without more, the UC Regents cannot assert Monsanto's

24   infringement of claims 1-2 by virtue of its use of the pBGH1 plasmid, which the evidence

25   demonstrates was not actually in use as of the time of infringement.

26      Accordingly, summary judgment on the issue of whether Monsanto's use of pBGH1

27

28

10

1   infringes claims 1-2 of the '941 patent is GRANTED as to Monsanto.[1]

2       pXT757.  Monsanto also presents evidence that it has not used its pXT757 plasmid

3   since making its master cell bank prior to February 2004.  See Van Loben Sels Decl., Exs. P

4   at CA-BST-098427; X at ¶ 94.  In response, the UC Regents asserts that pXT757 is used

5   daily during the fermentation and manufacturing of bGH, and that the creation of working cell

6   banks, which occurs every one and a half to two years, involves the testing of the DNA

7   sequence that is the subject of claims 1-2.  See, e.g., Engin Decl., Ex. F; Declaration of

8   Richard Flavell in support of UC Regents' Oppositions to Motions for Summary Judgment

9   ("Flavell Opp. Decl."), ¶ 10.

10      Contrary to the evidence it proffers with respect to pBGH1, with the above evidence,

11  the UC Regents has presented a disputed material fact with respect to Monsanto's use of

12  pXT757.  Accordingly, summary judgment on this issue is DENIED as to Monsanto.

13                          b.    Synthetic DNA

14      Monsanto asserts that, even if it is deemed to make or use pXT757, it still does not

15  infringe claims 1 and 2 because pXT757 is completely synthetic.  According to Monsanto, a

16  completely synthetic DNA sequence is outside the scope of claims 1 and 2, literally and under

17  the doctrine of equivalents.

18      First, Monsanto asserts that pXT757 does not literally infringe claims 1-2 because

19  synthetic DNA molecules encoding bGH were not known and available to a person of ordinary

20  skill in the art in 1980; construing the claims to cover only what the ordinary level of skill in the

21  art covered, Monsanto contends that the literal scope of claims 1-2 cannot cover synthetic

22  DNA sequences.

23      As to this, however, the parties have a material dispute, with the UC Regents asserting

24  that chemical synthesis of small strands of DNA was known to skilled artisans prior to August

25  1980, although the method of making longer DNA molecules developed afterwards.  See

27      [1]   Because the court so holds, it also holds that, as a matter of law, Monsanto's use
28  of pBGH1 does not infringe the remaining claims at issue.

1   Flavell Opp. Decl., ¶¶ 19-20; *cf.* Van Loben Sels Decl., Ex. X, ¶ 96.  In essence, this is a battle

2   of experts and must be decided by the trier of fact.

3          Second, Monsanto asserts that no infringement occurs under the doctrine of

4   equivalents, "in light of the prosecution history estoppel."  Since the court has already

5   determined, however, that prosecution history estoppel does not apply, Monsanto's argument

6   to this effect is unpersuasive.  Applying, therefore, the doctrine of equivalents, the issue

7   whether Monsanto's synthetic DNA molecules infringe on claims 1-2 is a question of fact.  <u>See</u>

8   <u>generally Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17 (1997).  Again, the

9   parties dispute whether a synthetic DNA molecule would have been substantially the same as

10  a regularly isolated DNA molecule.  <u>See</u> Van Loben Sels Decl., Ex. X; Flavell Opp. Decl., ¶¶

11  19-20.  As this dispute is material, summary judgment is inappropriate.

12         Accordingly, for all the above reasons, summary judgment on the issue of whether

13  Monsanto's use of pXT757 infringes claims 1-2 of the '941 patent is DENIED as to Monsanto.

14                 2.      <u>Claims 3 and 4</u>

15         Claim 4 is dependent on claim 3.  Together, claims 3 and 4 cover the recombinant

16  DNA molecules encoding bGH that comprise a specific nucleotide sequence, as well as any

17  bacteria that contains those recombinant DNA molecules.  Since the nucleotide sequence in

18  claim 3 is not literally identical to the nucleotide sequence used by Monsanto in its plasmid

19  pXT757, the UC Regents does not assert literal infringement of claims 3-4.  Rather, it relies

20  solely on the doctrine of equivalents to prove infringement.

21          The issue, then, is whether pXT757 performs substantially the same function in

22  substantially the same way, and to accomplish substantially the same result, as the DNA

23  sequence listed in claim 3.  <u>See Zelinski v. Brunswick Corp.</u>, 185 F.3d 1311, 1316-17 (Fed.

24  Cir. 1999) (an accused product is equivalent to a claimed element if the accused product

25  performs substantially the same function in substantially the same way to accomplish

26  substantially the same result as the claimed element).  In this, the parties disagree, and resort

27  to conflicting expert testimony for support.  For example, Monsanto asserts that the function of

28

12

United States District Court

For the Northern District of California

1  claim 3 is to require expression of the bGH protein; the UC Regents disputes this, claiming

2  that the purpose is merely to provide a blueprint for bGH.  <u>See</u> Van Loben Sels Decl., Ex. X;

3  Flavell Decl. In Support of Regents' Oppositions to Motions for Summary Judgment,¶ 12.  In

4  addition, Monsanto asserts that the cDNA sequence of claim 3 does not express at

5  commercial levels; the UC Regents assert that it does.  <u>Id</u>.

6       Each of these disputes presents a material factual dispute as to the issue of

7  equivalence, and is enough to defeat summary judgment on these claims.

8       Accordingly, summary judgment on the issue of whether Monsanto's use of pXT757

9  infringes claims 3 and 4 is DENIED as to Monsanto.

10               3.   <u>Claim 5</u>

11      Claim 5 is dependent on claim 2 and covers the recombinant DNA vectors that can

12 express a DNA segment encoding bGH amino acid nos. 2-191.  Monsanto resurrects its

13 previous arguments as to claims 1-4 in favor of non-infringement, including the argument that

14 pXT757 functions in a substantially different way from what is claimed – i.e., it functions to

15 commercially express bGH.

16      Accordingly, and for the same reasons that there are material disputed facts with

17 respect to claims 1-4, <u>see</u> above, summary judgment on the issue of whether Monsanto's use

18 of pXT757 infringes claim 5 is DENIED.

19               4.   <u>Claim 6</u>

20      Claim 6 is dependent on claim 5, and covers bacteria that contain DNA vectors that

21 encode for bGH.  Monsanto asserts that it does not infringe claim 6, either literally or under the

22 doctrine of equivalents, for the reasons already discussed.

23      Accordingly, for the same reasons that there are material disputed facts with respect to

24 the above claims, summary judgment  on the issue of whether Monsanto's use of pXT757

25 infringes claim 6 is DENIED.

26               5.   <u>Claim 7</u>

27      Claim 7 is dependent on claim 6.  It covers a method to produce bGH, which method is

28

United States District Court

For the Northern District of California

1    comprised of culturing bacteria that contains DNA vectors encoding for bGH under conditions

2    "wherein said expression is effected to produce" bGh, and "recovering [bGH] from the culture."

3    <u>See</u> Van Loben Sels Decl., Ex. Z.  This court construed "under conditions wherein said

4    expression is effected" to mean "using known and available conditions for culturing

5    microorganisms using the expression sequences of claim 5."  <u>See</u> Claim Construction Order

6    at 13.

7        Monsanto alleges that it does not infringe claim 7, either literally or under the doctrine of

8    equivalents, for the same reasons it doesn't infringe claim 6.  It also asserts, however, that it

9    doesn't infringe under the doctrine of equivalents because its culture conditions and

10   purification process function substantially differently to achieve a substantially different result

11   from known and available conditions and processes in 1980.

12       To that end, Monsanto, through its expert Dr. Georgiou, testifies that the "unique" cell

13   culture conditions include the use of nalidixic acid to induce protein production, the

14   determination of conditions necessary to maintain aerobic growth of large scale E.coli

15   cultures, and adjustment of temperature to maximize expression.  <u>See</u> Van Loben Sels Decl.,

16   Ex. X.  With respect to its purification methods, Monsanto claims that its "new" and previously

17   "unknown" discovery includes the multi-step sequence of obtaining the inclusion bodies from

18   the cells, dissolving and refolding the sometribove, purifying it from other impurities, and

19   forming zinc-dimers that could be administered to cows – all at a large scale, with high yield

20   and low cost.  <u>See</u> Van Loben Sels Decl., Exs. DD, FF, GG, X.

21       The UC Regents disputes this.  To begin with, it disputes Monsanto's claim that

22   separation of inclusion bodies from the cell culture does not constitutes "recovery" of bGH from

23   the culture.  More specifically, it disputes – with the testimony of its own expert, Dr. Flavell –

24   that the process of recovering bGH from the culture uses technology that was not known prior

25   to 1980.  <u>See generally</u> Flavell Opp. Decl.  The UC Regents claims that Monsanto's

26   technology, which involves using homogenizers and centrifuges, <u>was</u> known prior to 1980.

27   <u>See</u> Engin Decl., Ex. E; Flavell Opp. Decl., ¶ 9.  Moreover, the UC Regents specifically

28

14

United States District Court

For the Northern District of California

1  attacks Monsanto's claim that it introduced nalidixic acid – through use of the *recA* operator –

2  as a "new" culture condition to its process.  It claims – again through Dr. Flavell – that as of

3  August 1980, scientists generally knew that "culture media containing nalidixic acid would

4  cause the *recA* operator to activate protein expression."  Flavell Decl., ¶¶ 6-7.

5      The above constitutes a material factual dispute between the parties as to whether

6  Monsanto's methods were known and available as of 1980; whether Monsanto's methods

7  constitute "recovery" of bGH from the culture as described in claim 7; and whether Monsanto's

8  culture and purification methods function in substantially the same way to achieve substantially

9  the same result as the method covered in claim 7.

10     Accordingly, summary judgment on the issue of whether Monsanto's use of pXT757

11  infringes claim 7 is DENIED.

12          6.    Claim 8

13     Claim 8 is dependent on claim 2, and covers bacteria that contain DNA vectors that

14  encode for bGH.  Monsanto asserts that it does not infringe claim 8, either literally or under the

15  doctrine of equivalents, for the reasons already discussed with respect to claims 2 and 4.

16     Accordingly, and for the same reasons that there are material disputed facts with

17  respect to claims 2 and 4, see above, summary judgment on the issue of whether Monsanto's

18  use of pXT757 infringes claim 8 is DENIED

19          7.    Claim 9

20     Claim 9 covers bacteria that contains the bGH protein.  Monsanto asserts that it does

21  not infringe claim 9, either literally or under the doctrine of equivalents, for the reasons already

22  discussed with respect to claim 4.

23     Accordingly, and for the same reasons that there are material disputed facts with

24  respect to claim 4, see above, summary judgment on the issue of whether Monsanto's use of

25  pXT757 infringes claim 9 is DENIED.

26          8.    Claim 10

27     Claim 10 is dependent on claim 9 and covers methods of making bGH protein using

28

15

United States District Court

For the Northern District of California

1   bacteria that contains the bGH protein.  Monsanto asserts that it does not infringe claim 10,

2   either literally or under the doctrine of equivalents, for the reasons already discussed with

3   respect to claims 7 and 9.

4         Accordingly, and for the same reasons that there are material disputed facts with

5   respect to claims 7 and 9, <u>see</u> above, summary judgment on the issue of whether Monsanto's

6   use of pXT757 infringes claim 10 should is DENIED.

7   **III.    Invalidity**

8         Monsanto argues that the '941 patent is invalid.  Specifically, Monsanto argues (1) that

9   claims 1-10 are anticipated by the prior art; (2) that claims 1-10 are rendered obvious by the

10   prior art; (3) that claims 1-2 and 5-8 are invalid for lack of enablement; and (4) that claims 3-4

11   are invalid for lack of written description.  The UC Regents takes issue with each contention,

12   and offers its own affirmative argument that none of the claims covered by the '941 patent are

13   either anticipated, or rendered obvious.

14         A.   <u>Legal Standard</u>

15         A duly issued patent is presumed valid, and this presumption extends to each claim of

16   a patent.  <u>See</u> 35 U.S.C.A. § 282 (Supp. 2000); <u>see generally Bruning v. Hirose</u>, 161 F.3d

17   681, 685-86 (Fed. Cir. 1998).  One seeking to prove that a patent is invalid must do so by

18   clear and convincing evidence.  <u>See Helifix Ltd. V. Blok-Lok Ltd.</u>, 208 F.3d 1339, 1346 (Fed.

19   Cir. 2000).

20         Although courts are not bound by the PTO's decision to issue a patent, the PTO is due

21   a certain amount of deference and a presumption that it has done its job properly.  <u>American</u>

22   <u>Hoist & Derrick Co. v. Sowa & Sons Inc</u>., 725 F.2d 1350, 1359 (Fed. Cir. 1984).

23   Accordingly, if a challenger comes forward with no evidence different from that already

24   reviewed by the examiner who considered the patent application, the challenger's task is

25   difficult.  <u>Id</u>.

26         B.   <u>Preliminary Issues</u>

27         As an initial matter, the court must first resolve the parties' dispute over the proper legal

28

United States District Court

For the Northern District of California

1   standard to apply in defining the contours of what the prior art must disclose.  The UC Regents

2   asserts that, in order to anticipate the claims of the '941 patent directed to DNA molecules

3   encoding bGH, the prior art must disclose actual isolation of the DNA for bGH that the patent

4   covers.  Monsanto contests this assertion, and argues that the prior art need only disclose the

5   complete amino acid sequence encoding bGH, since that disclosure necessarily means

6   disclosure of all DNA molecules encoding bGH.  The parties rely on differing interpretations of

7   similar case law for support.   As explained below, that case law – while not dispositive on this

8   issue – is instructive.

9        The Federal Circuit in In re Bell, 991 F.2d 781 (Fed. Cir. 1993), considered whether

10   claims directed to specific DNA molecules encoding for human insulin-like growth factors I

11   and II (proteins) were rendered obvious in the face of prior art references disclosing (1) the

12   complete amino acid sequence for the proteins and (2) a general method for isolating DNA.

13   See 991 F.2d at 783.  The Federal Circuit held that such claims were not obvious, since the

14   prior art did not actually suggest the specific isolated DNA sequence claimed by the patent.

15   See 991 F.2d at 784.  In so holding, the court left open the possibility that a gene might be

16   rendered obvious in the face of a protein's complete amino acid sequence, if that amino acid

17   sequence is "specified exclusively by unique codons."  Id.

18        The Federal Circuit next considered the issue in In re Deuel, 51 F.3d 1552 (Fed. Cir.

19   1995).  At issue there were four claims directed to isolated DNA and cDNA sequences

20   encoding human and bovine heparin-binding growth factors ("HBGF"); two of the claims were

21   directed to specifically disclosed DNA molecules, and two claims generically encompassed

22   all isolated DNA sequences encoding the proteins.  See 51 F.3d at 1555.  The Federal Circuit

23   again found the claims non-obvious, this time in view of prior art references disclosing a

24   partial amino acid sequence of the HBGF proteins, and a general method of gene cloning.  In

25   re Deuel, 51 F.3d at 1557.  With respect to the claims directed at specific DNA molecules, the

26   court explicitly stated:  "[a] prior art disclosure of the amino acid sequence of a protein does

27   not necessarily render particular DNA molecules encoding the protein obvious ....   No

28

17

United States District Court

For the Northern District of California

1    particular one of these DNAs can be obvious unless there is something in the prior art to lead

2    to the particular DNA and indicate that it should be prepared." Id. at 1558-59.  The court also

3    noted that, "until the claimed molecules were actually isolated and purified, it would have been

4    highly unlikely for one of ordinary skill in the art to contemplate what was ultimately obtained.

5    What cannot be contemplated or conceived cannot be obvious." 51 F.3d at 1558.  As for the

6    generic claims, the court found them non-obvious on the basis that disclosure of a partial

7    amino acid sequence is insufficient to allow one to identify "all members" of the claimed

8    genus.  It acknowledged, however, that such generic claims *"might* have been obvious from

9    the complete amino acid sequence of the protein, coupled with knowledge of the genetic

10   code." Id. at 1560 (emphasis added).

11          Both In re Bell and In re Deuel therefore can rightly be read to stand for the proposition

12   advanced by the UC Regents – i.e., that prior art references must disclose the isolated DNA

13   sequence claimed in a patent, in order for that DNA sequence to be rendered obvious, or

14   anticipated.  It is true that one might argue that the cases leave open the question whether

15   disclosure of the complete amino acid sequence of a protein – where specified by unique

16   codons or otherwise described in such a way that knowledge of outside genetic methods

17   could be shown to identify all DNA sequences encoding the protein – can render claims to

18   generic DNA sequences for that protein obvious.  Nonetheless, such statements are dictum in

19   both cases, and do not control the decision here.

20          The court is not dissuaded from the above conclusion by Monsanto's reliance on In re

21   Wallach and In re Crish for the proposition that claimed DNA need not be isolated to be found

22   obvious or anticipated.  See 378 F.3d 1330 (Fed. Cir. 2004) and 393 F.3d 1253 (Fed. Cir.

23   2004), respectively.

24          In re Wallach held that without a full description of the amino acid sequence for a

25   protein, the court could not conclude that the applicant was in possession of the claimed DNA

26   sequences.  378 F.3d at 1335.  From this holding, Monsanto urges the conclusion that the

27   amino acid sequence for a protein is all that need be disclosed to trigger an obviousness

28

18

United States District Court

For the Northern District of California

1   finding as to claimed DNA sequences encoding for that protein.  In re Wallach, however,

2   cannot provide the basis for such a conclusion, as it dealt with the written description

3   requirement of 35 U.S.C. §112.  A written description inquiry is necessarily different from an

4   obviousness inquiry in the present context, as it deals with the question whether isolated DNA

5   claims of a patent can be sufficiently *described* from a generic description of the protein for

6   which all DNA claims encode, whereas the latter seeks to probe whether the isolated DNA

7   claims *have actually been identified* in form and substance.  Moreover, Monsanto ignores

8   that while the court recognized that the disclosure of an amino acid sequence may put one in

9   possession of the full genus of nucleic acids encoding it for written description purposes, it

10  qualified that concession with the follow-up acknowledgment that this would not necessarily be

11  enough to render "individual species within that genus ... obvious."  378 F.3d at 1334.

12          In re Crish is similarly inapposite.  While it held that claims to a specific nucleotide

13  sequence for the promoter region of a protein were anticipated, it so held because the prior

14  art already specifically disclosed and identified the same promoter region, both by size and

15  location; all the applicant had provided as "new" was the additional identification of the

16  promoter region by nucleotide sequence.  393 F.3d at 1258.  Notably, there was no contention

17  in In re Crish that the prior art disclosed the complete amino acid sequence for the protein at

18  issue.

19          In sum, and on balance, the court finds that under the relevant case law – typified by In

20  re Bell and In re Deuel –  the UC Regents' claims to isolated DNA molecules can only be

21  rendered obvious or anticipated by the prior art if the prior art references disclose the isolated

22  DNA molecules claimed or sufficient information such that would clearly point to or suggest the

23  isolated DNA molecules claimed.

24          Having dispensed with this preliminary issue, the court now turns to the merits of the

25  parties' arguments regarding invalidity.

26          C.          Anticipation

27          To prevail in its argument that claims 1-10 are anticipated, Monsanto must prove by

28

19

United States District Court

For the Northern District of California

1  "clear and convincing" evidence that all of the elements and limitations of each claim are

2  expressly or inherently found in a prior art reference.  See, e.g., Celeritas Techs. Ltd. v.

3  Rockwell Int'l Corp., 150 F.3d 1354, 1360 (Fed. Cir. 1998); Moba, B.V. v. Diamond

4  Automation, Inc., 325 F.3d 1306, 1321-22 (Fed. Cir. 2003) (a patent is anticipated if a single

5  invention that can be considered prior art contains all the elements of the patent).  Anticipation

6  is a question of fact.  See, e.g., Trintec Industries, Inc. v. Top-U.S.A. Corp., 295 F.3d 1292,

7  1294 (Fed. Cir. 2002) (citations omitted); Netscape Communications Corp. v. Konrad, 295

8  F.3d 1315, 1320 (Fed. Cir. 2002) (citation omitted).

9       Monsanto asserts that prior art references by Wallis and Dayhoff, as well as Itakura,

10  together anticipate the first ten claims of the '941 patent.  The UC Regents not only contests

11  this, but seeks the additional finding that prior art references by Sasavage et al. do not

12  anticipate.

13            1.    Wallis and Dayhoff (Claims 1-2)

14       It is undisputed that the Wallis/Dayhoff references disclose the complete amino acid

15  sequence of bGH.  The references do not disclose any isolated DNA sequence encoding

16  bGH or any recombinant DNA sequence encoding bGH.  See, e.g., Declaration of Irvin Tyan in

17  Support of Monsanto's Motion for Summary Judgment re Invalidity ("Tyan Decl."), Exs. E and

18  F.  Monsanto asserts that the Wallis/Dayhoff references, coupled with the common knowledge

19  of basic recombinant DNA techniques that existed at the time, expressly disclose the isolated

20  DNA molecules covered by the limitations of claims 1 and 2.  For support, it relies on its

21  expert, Dr. Georgiou.  See Tyan Decl., Ex. Z.

22       In so arguing, Monsanto relies on outside references – e.g., via reference to general

23  cloning methods – to prove anticipation.  This is allowed, but "such evidence must make clear

24  that the missing descriptive matter is necessarily present in the thing described in the

25  reference, and that it would be so recognized by persons of ordinary skill."  Continental Can

26  Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991).  Accordingly, the issue

27  is whether the general cloning methods relied on by Monsanto as outside references prove

28

United States District Court

For the Northern District of California

that the claimed DNA sequence of bGH were inherent in the Wallis/Dayhoff disclosures, and

that this would have been recognized by a person of ordinary skill.

On this point, the parties disagree.  Monsanto claims that one of ordinary skill would

have been able to use known and available techniques to obtain at least one DNA encoding

bGH.  <u>See</u> Tyan, Ex. Z at ¶¶ 135-137.  The UC Regents, by contrast, claims that the

Wallis/Dayhoff references do not allow a person of ordinary skill in the art to produce the

claimed bGH DNA.  <u>See</u> Flavell Declaration in Support of the UC Regents' Oppositions to

Summary Judgment ("Flavell Opp. Decl."), ¶¶ 23-24.

This constitutes a material dispute of fact that precludes entry of summary judgment on

the issue whether the Wallis/Dayhoff references anticipate claims 1-2 of the '941 patent.

Accordingly, summary judgment as to whether the Wallis/Dayhoff references anticipate claims

1-2 of the '941 patent is DENIED as to both parties.

### 2.   Itakura (Claims 1-10)

The Itakura reference is a U.S. patent entitled "Method and Means for Microbial

Polypeptide Expression."  <u>See</u> Tyan Decl., Ex. J.  Itakura discloses general recombinant DNA

techniques, and teaches that those techniques may be useful in the isolation of DNA

sequences for several types of proteins, among them bGH.  <u>Id</u>.  It is undisputed that Itakura

does not disclose bGH DNA or the amino acid sequence for bGH.

Monsanto asserts that the Itakura reference need not disclose either bGH DNA

specifically, or the bGH amino acid from which isolated bGH DNA is derived, in order to

anticipate claims 1-10.  It claims that the amino acid sequence for bGH may be imported into

Itakura from the Dayhoff reference, and that once that amino acid sequence is imported, this

fact obviates the need to expressly disclose the isolated bGH DNA claimed by the '941

patent, since the genetic code can be used to extrapolate bGH DNA from the amino acid

sequence.

Monsanto's argument overreaches.  The Itakura patent, on its face, is directed to

general recombinant DNA techniques and only broadly suggests the application of those

United States District Court

For the Northern District of California

1  techniques for use in conjunction with the bGH protein.  See Tyan Decl., Ex. J.  In view of the

2  court's holding that the actual isolated DNA claimed by the '941 patent must be disclosed in a

3  prior art reference in order for that reference to anticipate those claims, the court finds that

4  Itakura cannot serve as an anticipating reference here.

5       This result is different from that reached with respect to the Wallis/Dayhoff references,

6  since the Wallis/Dayhoff references, by virtue of disclosing the complete amino acid sequence

7  for bGH, *might* serve as an anticipating reference if Monsanto can prove that isolated bGH

8  DNA is inherent in the disclosure of the amino acid sequence for bGH (with reference to what

9  one skilled in the ordinary art could have accomplished).  Here, by contrast, additional steps

10  would be required, since Itakura is not on its face directed towards any technique or method

11  specific to bGH itself.

12       Accordingly, summary judgment as to whether the Itakura reference anticipates claims

13  1-10 of the '941 patent is GRANTED in favor of the UC Regents and DENIED as to Monsanto.

14       3.       Sasavage references (Claims 5-10)

15       The Sasavage et al. references disclose the nucleotide sequence corresponding to the

16  noncoding region of bGH and the DNA sequence encoding amino acids 189-191 of bGH.

17  See Declaration of Irvin Tyan in Opposition to UC Regents' Motion for Summary Judgment re

18  Invalidity ("Tyan Opp. Decl."), Exs. 6-7.  It is undisputed that the claims of the '941 patent are

19  directed to cDNA and recombinant DNA sequences encoding all 2-191 amino acids of the

20  bGH protein.  Monsanto nonetheless argues that Sasavage et al. disclosed the isolated DNA

21  for bGH, stating that a prior art reference does not have to disclose a "complete" DNA

22  sequence in order to be anticipatory.

23       Anticipation requires that a prior art reference disclose "all" claimed elements of a

24  patented product or process.  See, e.g., RCA Corp. v. Applied Digital Data Sys., 730 F.2d

25  1440 (Fed. Cir. 1984).  Here, Sasavage et al.'s disclosure of only three amino acids that

26  encode for bGH cannot qualify as anticipatory because (1) there are 188 amino acids that still

27  must be encoded before the claimed bGH DNA sequence is complete and (2) it is undisputed

28

United States District Court
For the Northern District of California

1  that the claims at issue here cover those segments of DNA that specifically encode for amino

2  acids 2-191 of bGH.

3       Accordingly, summary judgment as to whether the Sasavage et al. references

4  anticipate claims 5-10 of the '941 patent is GRANTED in favor of the UC Regents and

5  DENIED as to Monsanto.

6       D.    Obviousness

7       Alternatively, Monsanto argues – and the UC Regents disputes – that claims 1-10 of

8  the '941 patent are obvious.  Under 35 U.S.C. § 103, a patent may not be granted to an

9  invention if "the differences between the subject matter sought to be patented and the prior art

10  are such that the subject matter as a whole would have been obvious at the time the invention

11  was made to a person having ordinary skill in the art."  In other words, a patent is considered

12  invalid if at the time of invention, it would have been obvious for a person of ordinary skill in the

13  art at that time to combine two or more pieces of prior art to create the invention for a

14  reasonable likelihood of success.  See, e.g., Wesley Jessen Corp. v. Coopervision, 207 F.

15  Supp. 2d 1103, 1107 (C.D. Cal. 2002) (citations omitted).

16       Monsanto contends that certain prior art references, either independently or together,

17  combine to render the claims of the '941 patent obvious.  Specifically, it argues that the '941

18  patent claims are obvious due to: (1) the Wallis/Dayhoff references; (2) the Itakura references;

19  (3) the Rutter references; (4) the Goodman references; and (5) several references related to

20  rGh, hGH, and general cDNA isolation methods (Nilson/Gubbins/ Harpold/Roskam/Bell).

21            1.    Wallis/Dayhoff references

22       As discussed with respect to the anticipation argument above, the Wallis and Dayhoff

23  references disclose the complete amino acid sequence of bGH.  The references do not

24  disclose any isolated DNA sequence encoding bGH or any recombinant DNA sequence

25  encoding bGH.  See, e.g., Tyan Decl., Exs. E and F.

26       The court has already found that a finding of obviousness requires that the prior art

27  disclose isolation of the DNA sequences encoding bGH that are covered by claims of the '941

28

                                        23

United States District Court

For the Northern District of California

1  patent.  Since it is undisputed that the Wallis/Dayhoff references do not contain such a

2  disclosure, those references cannot support a finding of obviousness.

3        Accordingly, summary judgment as to whether the Wallis/Dayhoff references render

4  obvious any claims of the '941 patent is GRANTED in favor of the UC Regents.

5                    2.    Itakura references

6        The  Itakura references have also been discussed with respect to the anticipation

7  argument.  As noted there, Itakura discloses general recombinant DNA techniques, and

8  teaches that those techniques may be useful in the isolation of DNA sequences for several

9  types of proteins, among them bGH.  See Tyan Decl., Ex. J.  It is undisputed that Itakura does

10 not disclose either isolated bGH DNA, or even the amino acid sequence for bGH.

11        As is the case regarding the anticipation argument, in view of the court's holding that

12 the actual isolated DNA claimed by the '941 patent must be disclosed in a prior art reference

13 in order for that reference to render any claims obvious, Itakura cannot support an

14 obviousness finding here.

15        Accordingly, summary judgment as to whether the Itakura renders obvious any claims

16 of the '941 patent is GRANTED in favor of the UC Regents.

17                    3.    Rutter references

18        The Rutter references refer to a series of foreign patents and applications that,

19 according to Monsanto, "expressly disclose a method for obtaining cDNA encoding

20 mammalian proteins, specifically growth hormone and insulin."  See Tyan Opp. Decl., Exs. 23-

21 27.  As above, neither party disputes that the Rutter references do not disclose either isolated

22 bGH DNA, or the amino acid sequence for bGH.  Rather, the references are more generally

23 related to "the isolation of a specific nucleotide sequence which contains the genetic

24 information coding for a specific protein;" more specifically, insulin and growth hormone.  Id.,

25 Ex. 25 at CA-BST002425.   As such, for the reasons already stated, Rutter et al. cannot

26 support an obviousness finding here.

27        Accordingly, summary judgment as to whether Rutter et al. renders obvious any claims

28

United States District Court

For the Northern District of California

1    of the '941 patent is GRANTED in favor of the UC Regents.

2            4.    Goodman references

3        The Goodman references refer to the Goodman patents, which disclose cDNA

4    methods for obtaining the growth hormone for animal species, including man. See, e.g., Tyan

5    Opp. Decl., Ex. 29 at 29:37-34:53. It is undisputed that the Goodman references, on their

6    face, do not disclose any isolated DNA sequence – either by structure or chemical name – for

7    bGH in particular.

8        Again, as already stated, the court has held that the actual isolated DNA claimed by the

9    '941 patent must be disclosed in a prior art reference in order for that reference to render any

10   claims obvious. Hence, the Goodman references cannot support an obviousness finding.

11        Accordingly, summary judgment as to whether the Goodman references render obvious

12   any claims of the '941 patent is GRANTED in favor of the UC Regents.

13           5.    Nilson/Gubbins/Harpold/Roskam/Bell references

14        Finally, Monsanto asserts that the Nilson/Gubbins/Harpold/Roskam/Bell references,

15   which disclose general methods for screening cDNA and/or obtaining DNA sequences – all

16   based on human or rat growth hormone – render the claims at issue obvious. See, e.g., Tyan

17   Opp. Decl., Exs. 37-41.

18        The court's holding as to these references is no different than its holding as to the other

19   references above. Here, as there, the parties do not dispute that the references do not on

20   their face disclose an isolated DNA sequence for bGH, or even the complete amino acid

21   sequence for bGH.

22        Accordingly, summary judgment as to whether the above references render obvious

23   any claims of the '941 patent is GRANTED in favor of the UC Regents.

24       E.    Lack of Enablement

25        In addition, Monsanto argues that claims 1-2 and 5-8 of the '941 patent are invalid for

26   lack of enablement. Monsanto points out that these claims cover all compositions of DNA

27   molecules encoding bGH, including all degenerate DNA sequences, but that the specification

28

United States District Court

For the Northern District of California

1   does not teach how to make or use any of the degenerate DNA sequences. Accordingly,

2   argues Monsanto, the claims are not enabled. In response, the UC Regents contends that the

3   '941 patent teaches the methods that would allow one skilled in the art to chemically

4   synthesize DNA encoding bGH, including degenerate DNA sequences. The UC Regents

5   further points out that the law does not require that the patent teach how to make *every*

6   degenerate DNA sequence, just that the patent teach one skilled in the art to make and use

7   enough DNA sequences to justify grant of the claims sought.

8          To be considered enabled, the '941 patent's specification must enable one skilled in

9   the pertinent art as of the time the patent application was filed – i.e., 1980 – to make or carry

10  out the claimed invention without undue experimentation. See, e.g., Amgen, Inc. V. Chugai

11  Pharm. Co., Ltd., 927 F.2d 1200, 1212 (1991); Atlas Powder Co. v. E.I. du Pont De Nemours

12  & Co., 750 F.2d 1569, 1576 (Fed. Cir. 1984). Lack of enablement will not result merely

13  because some experimentation is necessary; only undue experimentation triggers a lack of

14  enablement finding. See id. Lack of enablement must be proven by clear and convincing

15  evidence. See Morton Intern, Inc. v. Cardinal Chemical Co., 5 F.3d 1464, 1469 (Fed. Cir.

16  1993).

17         Claims 1-2 and 5-8 of the '941 patent cover all DNA and recombinant DNA molecules

18  encoding bGH[2], and the bacteria comprising those molecules. As Monsanto points out, these

19  claims include all degenerate DNA sequences encoding the protein for bGH. Accordingly,

20  under the standard enunciated above, the issue before the court is whether the specification

21  contained in the '941 patent would enable one skilled in the art as of 1980 to obtain the

22  degenerate DNA sequences covered by the claims.

23         Preliminarily, the parties raise the question whether, as a matter of law, the

24  specification must disclose the means of making *every* degenerate DNA sequence covered

25  by the claims, or whether the specification need only disclose the means for making some

26  _____

27         [2]     The court has construed "bovine growth hormone" in turn to mean the protein
    defined by the amino acid sequence at positions 2-191 which is listed in claims 1-2 of the '941
28  patent. See Claim Construction Order at 9:27-10:1.

1    representative number of degenerate DNA sequences.  Monsanto relies on the general

2    enablement principles set forth in In re Goodman, 11 F.3d 1046, 1050 (Fed. Cir. 1993), for

3    support of its argument that the '941 patent must enable the "full" scope of the invention,

4    including all degenerate DNA sequences.  The UC Regents, by contrast, rely on Amgen for the

5    specific proposition that in the realm of recombinant DNA patents, enablement is satisfied so

6    long as the specification discloses enough representative sequences to justify grant of the

7    claims sought.  See Amgen, 927 F.2d at 1213.

8         The UC Regents is correct, and Amgen is instructive here.  In that case, the Federal

9    Circuit considered the validity of a patent for DNA sequences encoding the protein

10   erythropoietin ("EPO").  One of the patent's claims was a generic claim covering "all possible

11   DNA sequences that will encode any polypeptide having an amino acid sequence 'sufficiently

12   duplicative' of EPO" as to possess EPO's same properties.  See Amgen, 927 F.2d at 1212.

13   In ruling that this generic claim was not enabled, the court held that "[f]or DNA sequences,"

14   enablement means "disclosing how to make and use enough sequences to justify grant of the

15   claims sought."  927 F.2d at 1213.  Amgen's generic claim failed to meet this burden, since it

16   "claimed every possible analog of a gene containing about 4,000 nucleotides, with a

17   disclosure only of how to make EPO and a very few analogs."  Id. at 1214.  In so holding, the

18   court noted that there were millions of different analogs for the EPO protein alone, let alone

19   actual DNA sequences encoding for each specific EPO protein analog.  Id. at 1213.

20        Similarly, Amgen dictates that the '941 patent must disclose only those methods and

21   teachings that cover enough sequences to justify grant of the claims at issue.  This inquiry in

22   turn depends on the relevant facts.  See, e.g., Amgen, 927 F.2d at 1213 ("[w]hat is relevant" to

23   enablement regarding DNA sequences "depends on the facts").  For the reasons explained

24   below, however, the court is unable at this juncture to resolve the inquiry, as the factual

25   evidence is in dispute.

26        Here, the UC Regents argues that the specification contained in the '941 patent would

27   have enabled one skilled in the art to chemically synthesize DNA encoding bGH, including

28

United States District Court

For the Northern District of California

27

United States District Court

For the Northern District of California

1   degenerate DNA sequences.  Specifically, it argues that the references contained in the

2   specification (Itakura and Goeddel) teach the method to chemically synthesize DNA encoding

3   bGH, and provides the guidance on codon choice necessary to make degenerate sequences

4   encoding bGH.  See Tang Decl., Ex. 2.

5        In addition, the UC Regents asserts that even if not pointed out in the specification

6   itself, other techniques for altering nucleotides in a DNA sequence (i.e., creating degenerate

7   DNA sequences), such as site-directed mutagenesis, were well-known by one skilled in the art

8   as of 1980.  The UC Regents points out that well-known information need not have been

9   specifically included in the '941 patent.  See, e.g., Chiron Corp. v. Genentech, Inc., 363 F.3d

10  1247, 1254 (Fed. Cir. 2004) ("a patent disclosure need not enable information within the

11  knowledge of an ordinarily skilled artisan").  For factual support, the UC Regents relies on the

12  testimony of the inventors of the '941 patent and its own expert, as well as that of Monsanto's

13  expert, Dr. Georgiou.  See, e.g., Tang Opp. Decl., Exs. B, C; Flavell Opposition Decl., ¶¶ 16-

14  20.

15       Monsanto, by contrast, points to the same sources of evidence in support of the

16  opposite conclusion: specifically, it asserts that the inventors of the '941 patent did not believe

17  that the '941 patent taught "one skilled in the art how to change nucleotides to make

18  degenerate sequences, through site-directed mutagenesis or any other means."  See, e.g.,

19  Tyan Decl., Exs. C, D, L.  Monsanto also cites to the deposition testimony of Dr. Georgiou,

20  asserting that he testified that the '941 patent does not disclose a method to enable one

21  skilled in the art to make the degenerate sequences claimed.  See Garteiser Decl., Ex. H.

22       In view of this contradictory evidence, there is a disputed material fact on the issue of

23  enablement as to claims 1-2 and 5-8 of the '941 patent.  Accordingly, summary judgment as to

24  this issue is DENIED as to Monsanto.

25       F.    Lack of Written Description

26       Finally, Monsanto asserts that claims 3-4 of the '941 patent are invalid for lack of

27  written description.  It is undisputed that claim 3 sets forth an isolated nucleotide sequence for

28

United States District Court

For the Northern District of California

1    a recombinant DNA molecule encoding bGH.  See Tyan Decl., Ex. A at UCM014812.  Claim

2    4 is dependent on claim 3.

3         An adequate written description for genetic material requires a precise definition, "such

4    as by structure, formula, chemical name, or physical properties."  See Enzo Biochem, Inc. v.

5    Gen-Probe, Inc., 323 F.3d 956, 962-63, 970 (Fed. Cir. 2002); Regents of the Univ. of Cal. v.

6    Eli Lilly & Co., 119 F.3d 1559, 1566-67 (Fed. Cir. 1997).  The written description requirement

7    is fulfilled either by setting forth this information on the face of the patent, or through public

8    deposit of the genetic material claimed by the patent, since a written description is not always

9    practicable.  See id.  Invalidity due to lack of written description must be proven by clear and

10   convincing evidence.  See, e.g., Amgen Inc. v. Hoescht Marion Rouseel, Inc., 314 F.3d 1313,

11   1331 (Fed. Cir. 2003).

12        To support its assertion that claim 3 is insufficiently described, Monsanto argues (1)

13   that the DNA sequence recited on the face of claim 3 is incorrect; and (2) that the cDNA

14   deposited by the inventors of the '941 patent cannot be used to sufficiently describe the

15   particular degenerate DNA sequence listed in claim 3 in any event.  In response, the UC

16   Regents argues that the inaccuracy in claim 3 is due to a minor printing error that incorrectly

17   specifies codon 124 of the DNA sequence as "CTG" instead of "ATG," which fact is

18   immaterial in view of the prosecution history disclosing that the correct DNA sequence had

19   always been intended.  At any rate, continues the UC Regents, and contrary to Monsanto's

20   argument, the cDNA deposited by the inventors would have described all degenerate DNA

21   sequences to one skilled in the art, per the specification of the '941 patent.

22        While Monsanto claims that the specific degenerate DNA molecule described in claim

23   3 contains numerous errors, it provides few facts demonstrating those errors.  Rather, it relies

24   on deposition testimony stating only that there are, at worst, "ambiguities" between the

25   nucleotide sequence listed in claim 3, and a DNA sequence listed in the Wyochik Nucleic

26   Acids Research paper.  See Tyan Decl., Ex. D at 47:2-4; 48:17-20; 50:10-18; 94:20-95:1;

27   98:9-12.  That same testimony also discloses that the so-called "ambiguities" may have also

28

29

United States District Court

For the Northern District of California

1  been mere "differences" that were "silent," and therefore irrelevant to whether the DNA

2  molecule of claim 3 was adequately described.  Id.  Further demonstrating the weakness of

3  Monsanto's "error" claim, the UC Regents supports its assertion that the only "error" in claim 3

4  is a minor printing error, by referencing a prior PTO prosecution history filing in which "ATG" is,

5  in fact, correctly listed at position 124 of claim 3's nucleotide sequence.  See Declaration of

6  Steven Tang in Opposition to Monsanto's Motion for Summary Judgment re Invalidity ("Tang

7  Opp. Decl."), Ex. K at UCM000245.

8        Although the UC Regents correctly notes that the court may resolve this typographic

9  correction itself, see Hoffer v. Microsoft Corp., 405 F.3d 1326, 1331 (Fed. Cir. 2005), the

10  court need not reach that determination here.  Given the paucity of affirmative facts as to

11  "error" offered by Monsanto, it cannot be said that Monsanto has proven by clear and

12  convincing evidence that claim 3 is invalid for lack of written description.

13        As to whether the isolated DNA sequence of claim 3 is sufficiently described by virtue

14  of the inventors' deposit of the cDNA encoding bGH, Monsanto presents no factual evidence

15  that it is not.  Instead, Monsanto relies on the legal argument that in order for the cDNA deposit

16  to describe the specific DNA of claim 3, the '941 patent must disclose in its specification the

17  "specific alternative sequence" of claim 3, as well as a "manner and process of making and

18  using it."  Neither is claimed in the '941 patent, Monsanto asserts.

19        Monsanto's argument is contrary to established precedent.  In Enzo Biochem., Inc. v.

20  Gen-Probe Inc., 323 F.3d 956 (Fed. Cir. 2002), the Federal Circuit held that the proper legal

21  inquiry for determining whether a deposited nucleotide sequence adequately describes

22  "subsequences" or "mutated variants" thereof is "whether a person of skill in the art would

23  glean from the written description, including information obtainable from the deposits of the

24  claimed sequences, subsequences, mutated variants, and mixtures sufficient to demonstrate

25  possession of the generic scope of the claims."  322 F.3d at 966 (emphasis added).

26  Although claim 3 of the '941 patent is not a generic claim, as was the case in Enzo Biochem.,

27  this is a distinction without a difference here.  The fundamental inquiry here is whether one

28

30

United States District Court

For the Northern District of California

1  skilled in the art could glean, from the deposited cDNA sequence, the specific isolated and

2  degenerate DNA sequence listed in claim 3.  As to this, Monsanto presents no evidence to

3  contradict the UC Regents' assertion that one skilled in the art could have indeed done so.

4  See Tang Opp. Decl., Ex. B at 60:6-61:15; 62:18-63:7.  Again, therefore, Monsanto fails to

5  prove its argument by clear and convincing evidence.                Accordingly, summary

6  judgment on the issue of written description as to claims 3 and 4 of the '941 patent is DENIED

7  as to Monsanto.

8  **IV.    Inequitable Conduct**

9        Monsanto contends that the UC Regents is guilty of inequitable conduct, such that any

10  recovery for infringement is precluded.  Specifically, Monsanto points to four separate

11  examples of the UC Regents' purportedly inequitable conduct: (1) failure to disclose the '877

12  patent; (2) failure to disclose several foreign applications; (3) failure to disclose the Lingappa

13  reference; and (4) failure to disclose a collateral agreement made in connection with the Yeda

14  interference proceeding. The UC Regents moves for summary judgment as to all four.

15        A.    Legal Standard

16        Inequitable conduct refers to an applicant's, or an applicant's representative's, breach

17  of his or her duty to prosecute patent applications with candor, good faith, and honesty.  See

18  Li Second Family L.P. v. Toshiba Corp., 231 F.3d 1373 (Fed. Cir. 2000).

19        To prove inequitable conduct, a defendant must prove that the inequitable conduct was,

20  on some threshold level, both material and intended.  Halliburton Co. V. Schlumberger Tech.

21  Corp., 925 F.2d 1435, 1439 (Fed. Cir. 1991). The alleged conduct is material if there is a

22  substantial likelihood that a reasonable patent examiner would consider the information

23  important in deciding whether to allow the application of a patent to issue.  Life Techs. v.

24  Clontech Lab, 224 F.3d 1320, 1325 (Fed. Cir. 2000).  Generally, information is considered

25  material when it is not cumulative and (1) it establishes a prima facie case of unpatentability;

26  or (2) it refutes a position the applicant takes in arguing patentability.  See 37 C.F.R., ch. 1

27  (1999).   Intent, for its part, may be inferred from circumstantial evidence, under a totality of

28

31

United States District Court
For the Northern District of California

1    circumstances approach.  See, e.g., Lipman v. Dickinson, 174 F.3d 1363, 1370 (Fed. Cir.

2    1999).

3         Inequitable conduct must be proven by clear and convincing evidence.  See Goodyear

4    Tire & Rubber v. Hercules Tire & Rubber, 162 F.3d 1113, 1122 (Fed. Cir. 1998).

5         B.    Legal Analysis

6              1.    The '877 Patent

7         Monsanto claims that the UC Regents failed to disclose the '877 patent to the PTO

8    during prosecution of the '941 patent.

9         Case law provides that it is not inequitable conduct for an applicant not to resubmit, in a

10   divisional application, the information that was cited or submitted in the parent application.  In

11   other words, a material reference that is already of record in the parent application need not

12   be resubmitted by the applicant in a continuing application.  See ATD Corp. v. Lydall, Inc., 159

13   F.3d 534, 547 (Fed. Cir. 1998).  Accordingly, the issue here is whether the '877 patent, which

14   was also identified as the '710 application prior to issuance[3], was properly disclosed by the

15   UC Regents to the examiner during prosecution of any of the continuation applications that

16   eventually issued as the '941 patent.

17        As to this issue, there are no materially disputed facts.  The UC Regents' evidence

18   demonstrates that the '710 application was cited to the PTO examiner as an initial prior art

19   reference during prosecution of the '348 application – one of the precursor applications to

20   what eventually issued as the '941 patent.  See Declaration of Erik Olson in Support of Motion

21   for Summary Judgment re Inequitable Conduct ("Olson Decl. re Inequitable Conduct"), Exs. D

22   at 3; J.  The UC Regents also demonstrates that the examiner actually reviewed the '348

23   application that cited the '710 application.  See Declaration of John Scott in Support of UC

24   _____

25        [3]    Monsanto asserts that there is a "critical difference" between the '710 application,
     and the '877 patent that later issued based on the '710 application.   This argument is
26   unpersuasive.  Even if procedurally different, the two are directed to identical content.  And for
     purposes of the present inquiry, the issue is whether the UC Regents brought to the PTO
27   examiner's attention the content of what the '710 application (and therefore, the '877 patent)
     disclosed.  Notably, Monsanto makes no argument that the '877 patent was not identical to the
28   '710 application in substance.

United States District Court

For the Northern District of California

1  Regents' Replies re Motions for Summary Judgment ("Scott Reply Decl."), Ex. B at

2  UCM000004.  Monsanto does not actually dispute these facts, but relies on its expert, an ex-

3  examiner, who testified that, in his opinion, the UC Regents "failed to cite the '710 application

4  in the subsequent continuation applications."

5       This expert testimony is insufficient to overcome both the law and direct evidence cited

6  above, both of which demonstrate (1) that the UC Regents' citation of the '710 application in

7  the '348 application would have satisfied its obligation to cite the '710 application in

8  subsequent applications; and (2) that the UC Regents did, in fact, cite to the '710 application

9  in its '348 application.

10      Accordingly, summary judgment on the issue whether failure to cite the '877 patent

11  constitutes inequitable conduct is GRANTED as to the UC Regents.

12      2.   Foreign Applications

13      Monsanto asserts that the UC Regents knowingly withheld disclosure of certain foreign

14  applications, the content of which would have anticipated or rendered obvious the claims that

15  ultimately issued as the '941 patent.  The UC Regents does not deny that it failed to cite the

16  foreign applications, but states that there was no need to do so, since the foreign applications

17  are cumulative of the '877 patent, which as discussed above, was cited to the examiner.

18      It is true, as the UC Regents points out, that cumulative art will not serve as a basis for a

19  claim of inequitable conduct.  See 37 C.F.R., ch. 1 (1999).  The issue here, then, is whether

20  the foreign applications are in fact cumulative of the '877 patent.

21      Not surprisingly, the parties dispute this.  Monsanto points to its expert, Dr. Georgiou,

22  for proof that they are not cumulative.  The UC Regents points to the language of the foreign

23  applications, as well as its expert, Dr. Flavell, for proof that the foreign applications are

24  cumulative.  See, e.g., Declaration of Richard Flavell in Support of UC Regents' Motion for

25  Summary Judgment re Invalidity, ¶ 10; Olson Decl. re Inequitable Conduct, Exs. J at 26:39-44,

26  28:33 et seq.; H at 18:23-26, 21:2 et seq.  Monsanto, by contrast, points to the rebuttal report

27  of its expert witness, Dr. Georgiou, for proof that the foreign applications are not cumulative.

28

33

United States District Court

For the Northern District of California

1   <u>See, e.g.</u>, Declaration of John Val Loben Sels in Support of Monsanto's Opposition to Motion

2   for Summary Judgment re Inequitable Conduct ("Van Loben Sels Opp. Decl."), Ex. B at ¶¶

3   207, 209.

4         Accordingly, summary judgment on the issue whether failure to cite the foreign

5   applications constitutes inequitable conduct is DENIED as to the UC Regents.

6         3.   <u>Yeda Settlement</u>

7         In October 2002, the UC Regents and Yeda were involved in, and settled, an

8   interference proceeding before the PTO.  As part of that settlement agreement, Yeda

9   conceded the priority of the '941 patent over Yeda's own pending application.  The UC

10  Regents now seeks a declaration that the settlement agreement reached with Yeda was not

11  collusive.  In response, Monsanto apparently concedes the UC Regents' argument on this

12  front, and argues only that the UC Regents failed to disclose a collateral agreement to that

13  settlement agreement, in violation of law.

14        First, on the issue whether the settlement agreement with Yeda was collusive, the

15  evidence cannot support such a finding.  The UC Regents has produced both legal and factual

16  evidence in support of its claim that it had priority over Yeda.  <u>See, e.g.</u>, Olson Decl. re

17  Inequitable Conduct, Exs. U at 125:18-129:15; V at ¶ 3; W.  Moreover, it has provided the

18  testimony of Yeda's Chairman of the Board, Dr. Haim Garty, who testified that Yeda also

19  believed that they could not succeed in the interference proceeding before the PTO.  <u>See id.</u>,

20  Ex. Q at 69:4-22.  Monsanto, for its part, alleges no evidence whatsoever supporting an

21  inference of collusion.  Indeed it cannot, for it does not even address this argument in its

22  opposition.  Accordingly, the court finds in favor of the UC Regents on this issue.

23        Second, with respect to the UC Regents' disclosure of collateral agreements,

24  Monsanto's attempted argument fails.  The law requires the UC Regents, a party to a

25  settlement proceeding with Yeda, to disclose all agreements, including collateral agreements,

26  between the parties to the interference proceeding.  <u>See</u> 35 U.S.C. § 135(c).  Indeed, the

27  consequence for failure to file is to render all agreements between the parties unenforceable.

28

34

United States District Court

For the Northern District of California

1    See id.  Monsanto does not dispute that the UC Regents filed a copy of the actual settlement

2    agreement between itself and Yeda with the PTO.  It argues, however, that the UC Regents

3    were required to file with the PTO a copy of the collateral agreement between the UC Regents

4    and its own inventors.

5         This argument goes too far.  As the UC Regents points out, section 135(c) only

6    requires the submission of agreements or understandings "between the parties to the

7    interference."  Monsanto makes no claim for how or why this provision applies to a collateral

8    agreement between the UC Regents *and its inventors*, who were not themselves parties to

9    the interference proceeding.  Although Monsanto argues that the inventors were "real parties

10   in interest" to the proceeding, by virtue of the "interest in income" they received from the

11   biotechnology covered by the '941 patent, it presents no authority that the patent laws would

12   so define the inventors, or that any case has ever held section 135(c) to apply to such "real

13   parties in interest."  As such, it simply cannot be said that the UC Regents' failure to file copies

14   of its agreement with its inventors constitutes inequitable conduct.

15        Accordingly, summary judgment on the issue whether failure to disclose the UC

16   Regents' collateral agreement with its inventors constitutes inequitable conduct is GRANTED

17   as to the UC Regents.

18        4.    Lingappa Reference

19        Monsanto asserts that the UC Regents failed to disclose the Lingappa reference in a

20   timely manner, and that this delay constitutes inequitable conduct.  The UC Regents argues

21   that it is entitled to summary judgment on this issue because (1) Monsanto does not plead the

22   Lingappa article with particularity in its pleadings; and (2) the fact that Lingappa was cited to

23   the PTO, even if only eventually, precludes any finding of inequitable conduct.

24        The UC Regents correctly points out that inequitable conduct must be plead with

25   particularity in the first instance.  See Ferguson Beauregard/Logic Controls, Division of Dover

26   Resources, Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1344 (Fed. Cir. 2003) ("[I]nequitable

27   conduct, while a broader concept than fraud, must be pled with particularity.").  Monsanto does

28

35

**United States District Court**

For the Northern District of California

1    not dispute that it failed to even mention the Lingappa reference in its pleadings.  Nor does

2    Monsanto address any reason why it further failed to mention the Lingappa reference in its

3    motion for leave to amend its second answer, which it filed earlier before this court.

4    Accordingly, it cannot be said that Monsanto has discharged its burden to plead inequitable

5    conduct – as it relates to the Lingappa reference – with particularity.

6         Even if this were not the case, Monsanto has not presented any evidence

7    demonstrating even a threshold level of intent.  It cites only to the expert report of Lawrence

8    Goffney at paragraphs 64-73 and 97-98, which does not in and of itself contain any reference

9    as to how failure to timely cite Lingappa was intentional, or in any other way rises to the level of

10   inequitable conduct.

11        Accordingly, summary judgment on the issue whether the delay in citing Lingappa

12   constitutes inequitable conduct is GRANTED as to the UC Regents.

13   **V.    Prosecution Laches**

14        The UC Regents contends that the equitable doctrine of prosecution laches cannot bar

15   enforcement of the '941 patent because there is no evidence of the type of unreasonable

16   delay or egregious misconduct that is normally covered by the doctrine.  Although it

17   acknowledges the 24 year period of time that existed between the filing of the first application

18   related to the '941 patent and issuance of the patent, the UC Regents asserts that any delays

19   that took place were either due to actions taken by the PTO, or reasonable and necessary

20   actions taken by the UC Regents.  In response, Monsanto points out several instances in

21   which the UC Regents delayed issuance of the patent, and asserts that each was

22   unreasonable.

23        In Reiffin v. Microsoft Corp., 270 F. Supp. 2d 1132 (N.D. Cal. 2003), the court noted

24   that, in making a prosecution laches determination, the 'preponderance of the evidence'

25   standard governs.  See 270 F. Supp. 2d at 1152.  The Reiffin court also held, based on review

26   of prior cases, that "there is but one element of the defense of prosecution laches that

27   defendant must prove to prevail on this issue:  that plaintiff unreasonably delayed in the

28

36

United States District Court

For the Northern District of California

1    prosecution of his patents in a manner that cannot be reasonably explained." Id. at 1153.  In

2    assessing unreasonable delay, relevant considerations include:  whether (1) any unexplained

3    gaps exist in the prosecution history; (2) plaintiff, or the PTO, took any unusual steps to speed

4    or delay the application process; (3) plaintiff took any steps to limit public awareness of his

5    pending applications; and (4) the prosecution history of plaintiff's patents was typical of

6    patents in that field or patents generally.  See, e.g., 270 F. Supp. at 1155.

7         Taking those considerations into account here, the court finds that Monsanto cannot

8    meet its burden of proving prosecution laches:

9         First, Monsanto asserts that the UC Regents delayed the patent by deliberately

10   suppressing claims covering pre-growth bGH, on 5 different occasions over the years.  See

11   Declaration of Victoria Maroulis in Support of Monsanto's Opposition to UC Regents' Motion

12   for Summary Judgment re Prosecution Laches ("Maroulis Opp. Decl."), Exs. C; D at 76:13-

13   77:4.  But as the UC Regents correctly points out, none of the claims at issue in this

14   infringement action are directed to the UC Regents' pre-growth bGH claims; they are all

15   directed to the claims covering mature bGH.  As such, Monsanto's arguments – which should

16   instead be aimed at the mature bGH claims – fall short.  Moreover, none of the cases relied on

17   by Monsanto supports the application of prosecution laches on the basis of claims that are not

18   actually the subject of the litigation at hand.

19        Second, Monsanto asserts that the UC Regents' failure to cite the Lingappa reference

20   to the PTO is also proof of unreasonable delay.  However, as the UC Regents points out and

21   Monsanto does not dispute, the Lingappa reference also addressed the UC Regents' pre-

22   growth bGH claims.  See Maroulis Opp. Decl., Ex. C at UCM000838.  Accordingly, for the

23   reasons explained above, this reference does not aid Monsanto in proving prosecution

24   laches.

25        Third, Monsanto contends that the UC Regents unreasonably delayed issuance of the

26   '941 patent through its filing of three continuation applications, and through numerous requests

27   for extensions of time.  See, e.g., Maroulis Opp. Decl., Ex. E.  As to the filing of continuation

28

37

United States District Court

For the Northern District of California

1   applications, the UC Regents responds that the filing of three continuation applications is

2   expressly sanctioned as an alternative to an appeal under the Manual of Patent Examining

3   Procedure ("MPEP"), and that the number of continuation applications filed is at least equal to

4   those filed by others who have been issued patents, including Monsanto.  See Declaration of

5   Erik Olson in Support of UC Regents' Motion for Summary Judgment re Prosecution Laches

6   ("Olson Decl."), Exs. 21; 34.  As to its requests for extensions of time, the UC Regents points

7   again to relevant provisions of the MPEP that allow for extensions of time without justification,

8   as well as testimony by the UC's patent prosecutor stating that requests for extensions of time

9   are common practice during patent prosecutions.  See id. at Ex. 5 at 61:25-62:12, 106:14-

10  107:4; see also id. at Ex. 34.  Monsanto does not directly contradict this evidence, and relies

11  only on the testimony of Dr. Goffney, who cannot affirmatively provide evidence that the UC

12  Regents acted unreasonably.  Accordingly, in view of the evidence as a whole, it simply cannot

13  be contended that either the filing of three continuation applications or 12 requests for

14  extensions of time were necessarily unreasonable.

15      With respect to whether the UC Regents took steps to limit public awareness of its

16  patent application, the UC Regents sets forth evidence demonstrating that as early as 1980,

17  the inventors of the patent published an article describing in part the content of the '941 patent.

18  See Olson Decl., Ex. 17.  The UC Regents also demonstrated other means by which they

19  disclosed the invention claimed in the '941 patent.  See id. at Exs. 33; 35.

20      Finally, as to the last relevant consideration at issue, Monsanto contests whether the

21  24-year time frame involved in prosecuting the '941 patent was typical of patents in its field.

22  The UC Regents acknowledges that the '941 patent took "substantially longer to issue" than

23  the average patent, but claims that it is not atypical of patents in the "biotechnology, chemical,

24  or biomedical-related" fields, in which at least 30 U.S. patents took 16 years or longer to

25  issue.  See Olson Decl., Ex. 31.  Monsanto, in response, asserts that the proper field for

26  comparison is the molecular biology and microbiology class to which the '941 patent belongs,

27  in which the '941 patent was prosecuted for longer than "99.99% of those patents."  See

28

38

United States District Court
For the Northern District of California

1    Declaration of Kimberly Moore in Support of Monsanto's Opposition to UC Regents' Motion

2    for Summary Judgment re Prosecution Laches ("Moore Opp. Decl."), ¶¶ 9, 15.

3          This factual dispute, however, is not enough to save Monsanto's argument. This is

4    because there are no "strict time limitations" for determining whether prosecution laches

5    exists. <u>See, e.g., Symbol Technologies, Inc. v. Lemelson Med., Educ. & Research Found</u>.,

6    LP, 422 F.3d 1378, 1385 (Fed. Cir. 2005). Rather, as explained above, the central issue is

7    simply whether the UC Regents engaged in "unreasonable" delay, under a totality of the

8    circumstances approach. <u>See id</u>. at 1386. And for all the reasons given above, Monsanto

9    cannot set forth, sufficiently to meet the preponderance of the evidence standard, sufficient

10   facts as would justify the application of prosecution laches to this case.

11         In sum, it simply cannot be said, based on the facts, that application of the doctrine of

12   prosecution laches is justified in the instant case. Accordingly, summary judgment on the

13   issue whether prosecution laches applies is GRANTED in favor of the UC Regents and

14   DENIED as to Monsanto.

15   **VI.    Damages**

16         Monsanto also takes issue with the damages theory advanced by the UC Regents

17   through their expert, Dr. Leitzinger. Monsanto argues that, as a matter of law, the UC Regents

18   are not entitled to either (1) a reasonable royalty in the form of a lump sum paid-up license that

19   spans the life of the patent; or (2) an assessment of any royalty on the sales of POSILAC

20   manufactured prior to the 2004 issuance of the '941 patent. As explained below, Monsanto is

21   correct only as to the latter.

22         A.    Lump Sum, Paid-Up License

23         The UC Regents seeks a damages award based in part on a reasonable royalty, in the

24   sum of a fully paid-up license for the life of the patent, which hypothetical license is based on

25   evidence of Monsanto's projected sales. Monsanto asserts such a theory is unsupported by

26   law. As a review of the case law makes clear, however, a fully paid up royalty spanning the life

27   of the patent is an allowable form of damages.

28

39

United States District Court

For the Northern District of California

1        A reasonable royalty "is the amount that 'a person, desiring to manufacture, use, or sell

2   a patented article, as a business proposition, would be willing to pay as a royalty..." as of the

3   time of infringement.  See, e.g., Trans-World Manufacturing Corp. v. Nyman & Sons, Inc., 750

4   F.2d 1552 (Fed. Cir. 1984).  This determination is a question of fact, and is based on a

5   hypothetical arms-length negotiation which the court presumes would have taken place on the

6   date of infringement.

7        It is true, as Monsanto points out, that the purpose of a reasonable royalty rate as

8   damages in a patent case is to compensate the patentee for actual infringement of the patent,

9   based on the alleged infringer's use of the patented product.  See, e.g., Fromson v. Western

10  Litho Plate & Supply Co., 853 F.2d 1568, 1578 (Fed. Cir. 1988).  Monsanto errs, however, in

11  assuming that awarding damages for past or present infringing conduct necessarily prohibits

12  a reasonable royalty that includes a fully-paid up license for the lifetime of the patent, when

13  based on projected sales.

14       The Federal Circuit has explained that reasonable royalty rates can encompass

15  projected sales as of the time of infringement, even if those sales have not actually taken

16  place.  See, e.g., Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371 (Fed. Cir.

17  2001).  There, the court upheld the testimony of plaintiff's damages expert, who opined as to

18  the proper royalty amount based on projections of defendant's future sales, which sales were

19  not even limited to sales of the offending product alone.  See 274 F.3d at 1384.  The

20  Interactive Pictures court expressly acknowledged "the rule that recognizes sales expectations

21  at the time when infringement begins as a basis for a royalty base as opposed to an after-the-

22  fact counting of actual sales."  Id. at 1385.

23       The Federal Circuit has also contemplated the issue of reasonable royalties during the

24  life of the patent before.  In Trans-World Mfg. Corp., the court referred to prior precedent and

25  acknowledged a prior holding in which it held that "the district court should have based its

26  determination of a reasonable royalty on a flat license fee for the use during the life of the

27  patent of each infringing machine rather than (as it did) on a percentage of the selling price of

28

40

United States District Court

For the Northern District of California

1    the infringer's product made on the infringing machine." Trans-World, 750 F.2d at 1565.

2          A look at the prior case referenced, Stickle v. Heublein, Inc., 716 F.2d 1550 (Fed. Cir.

3    1983), is instructive.  There, the court determined the scope of damages in a case for patent

4    infringement in which the defendant also claimed a valid license as a defense.  It is true that

5    the case dealt primarily with questions of damages awards as to successive infringers, as well

6    as whether injunctive relief affects the scope of a reasonable royalty award.  Nonetheless, the

7    court made clear that it was determining the proper scope of a reasonable royalty with respect

8    to evidence of a hypothetical arms-length negotiation at the time of infringement, and

9    concluded that sufficient evidence supported a finding that such a negotiation would have

10   included a fully paid up license for the life of the patent. See 716 F.2d at 1563.

11         While it quarrels with the above, Monsanto fails to cite to any authority that persuasively

12   holds that a reasonable royalty based on projected sales for the life of the patent is prohibited.

13   It relies on Unisplay, S.A. v. American Electronic Sign Co., 69 F.3d 512 (Fed. Cir. 1995), but

14   that case is inapposite.  Unisplay rejected the relevancy of evidence proffered to support the

15   argument that a reasonable royalty could constitute an up-front licensing fee in combination

16   with a running royalty percentage.  But it rejected the evidence because the expert proffering

17   the evidence did not tie his hypothesis of a reasonable royalty to the time of infringement (and

18   merely referred to what would be reasonable at the time of trial). Unisplay, 69 F.3d at 518.

19   This is not the case here.  The Unisplay court also rejected certain calculations of an up-front

20   licensing fee that the plaintiff attempted to introduce as evidence because the plaintiff had

21   neglected to explain how those calculations reflected what the parties might have agreed to in

22   an arms-length negotiation.

23         On balance, therefore, given the above cases, the court cannot hold that a damages

24   theory that includes reasonable royalties based on projected earnings and license fees that

25   include the life of the patent is precluded as a matter of law.  This is particularly so, given the

26   evidence presented by the UC Regents in its reply, asserting that an arms-length transaction

27   at the time of infringement would have included contemplation of a license fee for the life of the

28

41

United States District Court

For the Northern District of California

1  patent.

2      Accordingly, summary judgment on the issue of whether the UC Regents may assert

3  damages based on a reasonable royalty in the form of a lump sum paid-up license is DENIED

4  as to Monsanto.

5      B.      Pre-Infringement Sales

6      Monsanto also seeks a declaration that the UC Regents is not entitled, as a matter of

7  law, to base any damages award on product made prior to the time of infringement – i.e.,

8  February 2004.

9      The UC Regents concedes in its opposition that it is not claiming any damages based

10  on pre-infringement product.  Accordingly, summary judgment as to this particular issue in

11  GRANTED in Monsanto's favor.

12  **VII.   Motion to Preclude Expert Testimony**

13      In conjunction with its argument regarding the UC Regents' damages theory, Monsanto

14  also moves to preclude the expert testimony of Dr. Leitzinger, the UC Regents' damages

15  expert upon whose opinion the above damages theory is based.  Monsanto generally argues

16  that Dr. Leitzinger's testimony is contrary to law and fact, such that exclusion is justified.  For

17  the reasons below, Monsanto's arguments fail.

18      First, Dr. Leitzinger's opinion is not contrary to law.  The law, as indicated above,

19  supports a damages theory that allows for a reasonable royalty to be based on projected

20  future sales.  As for Monsanto's claim that including non-infringing sales is contrary to law,

21  Monsanto ignores the holding of Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d

22  1371, 1385 (Fed. Cir. 2001), which specifically held that the reasonable royalty award in that

23  case included contemplation of all products made by the infringer, and that the damages

24  expert "did not provide for an unfair double recovery by factoring [infringing and non-infringing

25  sales] into the royalty rate."  The court further rejects Monsanto's claim that apportioning the

26  entire value of the product to the '941 patent is contrary to law.  The cases cited by the UC

27  Regents are persuasive on this point, which hold that damages may be based on the "entire

28

42

United States District Court

For the Northern District of California

1  market value" of a product where the patent-related feature of a product is the basis for

2  customer demand.  See, e.g., Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1549 (Fed.

3  Cir. 1995).[4]   For all these reasons, Monsanto's argument that Dr. Leitzinger's damages

4  opinion advances an unreliable damages theory fails.

5        As for its factual argument that Dr. Letizinger's theory is unsupported by sufficient

6  evidence, Monsanto's arguments are better made to a jury, not the court.  Despite Monsanto's

7  purported evidence to the contrary, the UC Regents point to several instances in which Dr.

8  Leitzinger rests his expert opinion on facts specific to this case, and further points to

9  supporting evidence in doing so.  See, e.g., Declaration of Jeffrey Leitzinger in Support of UC

10  Regents' Opposition to Motion for Summary Judgment re Damages ("Leitzinger Decl."), Ex. B;

11  see also Declaration of John Scott in Support of UC Regents' Opposition to Motion for

12  Summary Judgment re Damages ("Scott Opp. Decl."), Ex. 10.  Dr. Leitzinger merely reaches

13  a different result than would Monsanto.  Accordingly, Monsanto's arguments go to weight, not

14  admissibility.

15        Finally, Monsanto warns of the dangers of a double recovery, since the UC Regents

16  has alleged relief that includes injunctive relief, in addition to monetary damages.  While this is

17  a valid issue, it is one that can be taken into account at trial.  Moreover, Monsanto cites to no

18  authority for the proposition that an expert must expressly discount for the value of any

19  potential injunction in the content of his opinion as a prerequisite to providing expert testimony.

20        For all the reasons above, the court denies Monsanto's request to exclude the

21  testimony of the UC Regents' damages expert.  Accordingly, and as stated at the hearing, the

22  court DENIES Monsanto's motion to preclude the expert testimony of the UC Regents' expert,

23  Dr. Letizinger.

24  **VIII.   Conclusion**

25        For the reasons stated above, the court hereby GRANTS summary judgment in part

26  _____

27        [4]     Though Monsanto tries to limit this doctrine to patents that cover machines or
    apparatus only, the doctrine applies to a product or unit as well.  This includes POSILAC, which

28  has as its main active ingredient sometribove – i.e., bGH, the precise patent feature at issue here.

and DENIES summary judgment in part, as follows:

1. <u>Infringement</u>.  The court GRANTS Monsanto's motion for summary judgment on the issue whether its use of pBGH1 infringes claims 1-10 of the '941 patent, and DENIES Monsanto's motion for summary judgment on the issue whether its use of pXT757 infringes claims 1-10 of the '941 patent.

2. <u>Validity (Anticipation)</u>.  The court DENIES both parties' motions for summary judgment as to whether the Wallis/Dayhoff references anticipate claims 1-2 of the '941 patent; GRANTS summary judgment as to the UC Regents and DENIES summary judgment as to Monsanto on the issue whether the Itakura references anticipate claims 1-10 of the '941 patent; and GRANTS summary judgment as to the UC Regents and DENIES summary judgment as to Monsanto on the issue whether the Sasavage references anticipate claims 5-10 of the '941 patent.

3. <u>Validity (Obviousness)</u>.  The court GRANTS summary judgment in favor of the UC Regents as to whether the Wallis/Dayhoff, Itakura, Rutter, Goodman, or Nilson/Gubbins/ Harpold/Roskam/Bell references render obvious any claims of the '941 patent.

4. <u>Validity (Lack of Enablement)</u>.  The court DENIES summary judgment as to Monsanto on the issue whether claims 1-2 and 5-8 of the '941 patent are invalid for lack of enablement.

5. <u>Validity (Lack of Written Description)</u>.  The court DENIES summary judgment as to Monsanto on the issue whether claims 3 and 4 of the '941 patent are invalid for lack of written description.

6. <u>Inequitable Conduct</u>.  The court GRANTS summary judgment in favor of the UC Regents on the issue of inequitable conduct as to (1) failure to disclose the '877 patent; (2) failure to disclose a collateral agreement made in connection with the Yeda interference proceeding; and (3) failure to disclose the Lingappa

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    reference.  The court DENIES summary judgment on the issue of inequitable

2    conduct as to failure to disclose the foreign applications.

3    7.    Prosecution Laches.  The court GRANTS summary judgment as to the UC

4    Regents on the issue whether prosecution laches applies, and DENIES

5    summary judgment as to Monsanto.

6    8.    Damages.  The court DENIES summary judgment as to Monsanto on the issue

7    whether damages based on a reasonable royalty in the form of a lump sum

8    paid-up license may be asserted; and GRANTS summary judgment to

9    Monsanto on the issue whether damages based on pre-infringement product

10   may be asserted.

11   9.    Motion to Exclude.  The court DENIES Monsanto's motion to preclude the expert

12   testimony of the UC Regents' expert, Dr. Leitzinger.

13

14   **IT IS SO ORDERED.**

15   Dated:  December 16, 2005

16

17   _____
     PHYLLIS J. HAMILTON
     United States District Judge

18

19

20

21

22

23

24

25

26

27

28

45